UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LISA RICCHIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 15-13519-FDS |
| | ) | |
| BIJAL, INC. d/b/a SHANGRI-LA MOTEL; | ) | |
| ASHVINKUMAR PATEL; SIMA PATEL; | ) | |
| and CLARK McLEAN, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action arising under the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA") and the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"). Plaintiff Lisa Ricchio alleges that she was taken hostage in June 2011 at the Shangri-La Motel in Seekonk, Massachusetts, by defendant Clark McLean, who raped and abused her for a period of several days. Defendant Bijal, Inc. owns the motel. Defendants Ashvinkumar and Sima Patel worked and lived at the motel at the time of Ricchio's alleged captivity. The complaint alleges, in substance, that defendants knowingly benefitted from the sex trafficking activities of McLean.

Bijal, Inc. and the Patels have filed a motion for summary judgment. For the following reasons, the motion will be denied.

I.  **Background**

   A.  **Factual Background**

Under Local Rule 56.1, a party moving for summary judgment is required to "include a concise statement of the material facts of the record as to which [they] contend[] there is no genuine issue to be tried," "with page references to affidavits, depositions, and other documentation." The statement of material facts submitted by defendants, who are the moving parties, does not satisfy that standard. Rather than identifying specific material facts with specific citations to the record, defendants instead provide blanket references to what they contend are "material portions" of various depositions. Although the motion could be denied simply for failure to comply with the rule, the Court has nonetheless attempted to determine, based on its own examination of the record, whether there is a genuine dispute of material fact.

   1.  **The Shangri-La Motel**

The Shangri-La Motel in Seekonk, Massachusetts, is owned by Bijal, Inc. (Ila Patel Dep. at 16). Bijal is owned by Ila Patel. (*Id.* at 15-16). Ila Patel is married to Shailesh (Sunny) Patel. (*Id.* at 16). Ashvinkumar (Ashvin) Patel is Sunny Patel's first cousin. (Sunny Patel Dep. at 18). Ashvin Patel is married to Sima Patel. (*Id.*).

Ila Patel bought the Shangri-La Motel with her then-husband in 1984. (Ila Patel Dep. at 17). In 1988, Ila and her husband established Bijal for the purpose of running the Shangri-La Motel. (*Id.*). Ila's husband passed away in 1992. (*Id.* at 36).

Sunny Patel arrived in the United States in 1995. (Sunny Patel Dep. at 10). In 1996, he married Ila. (*Id.*). After marrying Ila, Sunny started working with her at the motel. (*Id.* at 11). The two of them also began living together at the motel and remained living there until 2003. (*Id.* at 14).

In 2003, Ila and Sunny moved from the motel to a house Sunny had purchased, and Ashvin Patel and his wife Sima began working and living at the motel. (Ashvin Patel Dep. at 11, 29).[1] Ila remained the motel's manager, and Ashvin and Sima performed cleaning and maintenance work. (*Id.* at 18, 20). At times, Ashvin and Sima would "fill in" for Ila and help check-in customers. (*Id.*). In return for their work, Asvhin and Sima were paid a yearly salary by Bijal and provided with free lodging at the motel. (*Id.* at 26-28; Sima Patel Dep. at 29-31).

2. **The Events of June 2011**

In 2010, Lisa Ricchio was living in Maine. She met a man named Clark McLean through one of McLean's "drug customer[s]" during the winter of 2010. (McLean Dep. at 24, 42). McLean did not tell Ricchio his real name, and instead told her that his name was "A," "Antoin Hobson," or "Adrian Hobbs." (Ricchio Test'y at 14; McLean Dep. at 25).

After meeting, McLean would call or text Ricchio from "time to time." (McLean Dep. at 89). McLean, who lived in Taunton, Massachusetts, would travel frequently to Maine for his "drug dealing" business. (*Id.* at 89, 98). He would see Ricchio while he was in Maine. (*Id.* at 89). The two eventually developed a relationship. (Ricchio Test'y at 13; McLean Dep. at 90).

In May 2011, Ricchio attended what she calls a "healthy living program" in Utah to "manage [her] chronic and daily pain, and to get off . . . all my narcotics . . . and all my medications." (Ricchio Test'y at 15). Ricchio and McLean continued to text and call each other while she was in Utah. (*Id.* at 19). Around the end of May, she "graduated" from the program and returned to Maine. (*Id.* at 20, 24).

On June 1, 2011, McLean called Ricchio and asked her to visit him in Massachusetts.

---

[1] The Patels' young daughter, Tulsi, also lived at the motel. (Ashvin Patel Dep. at 30). The Patels also have another daughter who appears to have been born while the Patels were living at the motel around the year 2004. (Ashvin Patel Dep. at 29; Ila Patel Dec.¶ 6). Asvhin, Sima, and their two daughters lived at the motel until 2015. (Asvhin Patel Dep. at 11).

3

(Ricchio Test'y at 22-23; McLean Dep. at 93). Ricchio contends that he was "very upset" and "crying," and that he told her that he had cancer. (Ricchio Test'y at 23). McLean denies doing so. (McLean Dep. at 94).

Ricchio drove to Massachusetts to see McLean. (Ricchio Test'y at 25-26). According to McLean, she met him on Pine Street in Taunton. (McLean Dep. at 167).

According to Ricchio, McLean told her to enter the driver seat of his car and begin driving. (Ricchio Test'y at 29).[2] McLean gave her directions, and they ultimately arrived at the Shangri-La Motel. (*Id.*).

McLean testified that he had previously stayed at the Shangri-La Motel for an "extended period" of approximately four months and was familiar with Ashvin and Sima Patel, although he did not know them by name. (McLean Dep. at 69, 70). When asked when his extended stay at the motel had been, McLean answered, "either, like, 1999, or 2000." (*Id.* at 71). Ashvin and Sima Patel, however, did not begin working or living at the motel until 2003. McLean also testified that he had stayed at the motel "give or take ten times probably" for shorter periods between the early 2000s and 2011. (*Id.* at 73). He also testified that he was friendly with the Patels and that they were familiar with each other. (*Id.* at 74).

When they arrived at the motel, Ricchio paid for a room for her and McLean. (Ricchio Test'y at 30; McLean Dep. at 103).

After checking in at the motel, Ricchio says that McLean took her car keys and her cell phone. (Ricchio Test'y at 31, 34). McLean denies doing so. (McLean Dep. at 179, 213).

According to Ricchio, later that night, McLean forced her to have oral and vaginal sex. (Ricchio Test'y at 39-40, 45). McLean contends that she consented to the sex. (McLean Dep. at

---

[2] McLean contends that he, not Ricchio, drove the car to the Shangri-La Motel. (McLean Dep. at 169).

4

199-200).

Ricchio says that she then attempted to get out of the room while McLean started to fall asleep. (Ricchio Test'y at 47). According to her, she saw the "wife" that ran the motel directly outside of her room, that she begged the wife for help, and that the wife then brushed her aside, "kind of laughed," and "walked away." (*Id.* at 48). McLean then "burst[]" out of the room, grabbed her by the neck, and threw her back into the room. (*Id.* at 48).

McLean denies that Ricchio ever tried to escape, and denies that he ever beat her in front of Sima Patel. (McLean Dep. at 104-05). Sima Patel also denies having seen McLean beat or drag Ricchio, and denies that she ever pleaded to her for help. (Sima Patel Dep. at 99). Defendants contend that the Patels, who are native Gujarati speakers, did not speak English at all during the time period at issue, and speak only broken English now. (Tulsi Patel Dep. at 16, 24).

Ricchio and McLean appear to have remained at the motel until June 5 or June 6, 2011. (McLean Dep. at 171; Ricchio Test'y at 79).

During their time at the motel, according to Ricchio, McLean continued to rape her and abuse her both verbally and physically, including by putting a lit cigarette into her vagina. (Ricchio Test'y at 56-58). Eventually, McLean made clear to her that he intended to force her into prostitution. (Police Report at 6-7). She also says that he forced her to take pills, although the type of drug is unclear. (Ricchio Test'y at 52, 62).

McLean denies that he either raped or abused Ricchio, that he intended to force her into prostitution, and that he forced her to ingest pills. (McLean Dep. at 45-46, 90, 99-100). He acknowledges, however, that he sold her both cocaine and prescription pills while they were staying at the motel. (*Id.* at 45-46). He says that she was under the influence of narcotics "the whole time" they were at the motel. (*Id.* at 211).

According to Ricchio, she and McLean encountered Ashvin or Sima Patel on three other occasions during their time at the motel. On one occasion, she and McLean came across Ashvin in the motel parking lot, and that she saw McLean give him a "high-five" and tell him "[l]et's get this thing going again." (Ricchio Test'y at 60). McLean and Ashvin both deny it happened. (Ashvin Patel Dep. at 130).[3] On another occasion, McLean and Ricchio saw Sima; McLean greeted her, and she said something to the effect of "long time no see." (Ricchio Test'y at 69). On a third occasion, Sima knocked on the door of the room that she and McLean were staying in and stated that they needed to pay more money for their stay. (*Id.* at 74). McLean later gave Ricchio money that she then paid to Sima. (*Id.* at 74). Sima testified that she would at times knock on guests' doors when they had not paid enough for their stay, but says that she does not remember whether she knocked on McLean's door during their stay. (Sima Patel Dep. at 94).

According to Ricchio, on their final day at the motel, McLean forced her to drive them both to her car, and then forced her to get into the car with him. (Ricchio Test'y at 80).[4] Ricchio says that McLean then had her drive him to a "really bad part of town," where he got out and told her to wait in the car. (*Id.* at 80). After approximately half an hour, she heard a ring and realized that her cell phone was tucked under the passenger seat of the car. (*Id.* at 81). Once she realized she had her phone, she "took off" driving and called her mother. (*Id.* at 82-83). She says that her parents then met her at a gas station near I-95 and helped her drive home to Maine. (*Id.* at 83-84).

According to McLean, he and Ricchio left the Shangri-La Motel on June 5, and that he drove her to her car. (McLean Dep. at 190). He says that he then had Ricchio drive him

---

[3] Although he denies that this specific event occurred, Ashvin Patel does recall that he "used to see" Ricchio and McLean at the motel. (Ashvin Patel Dep. at 131).

[4] Ricchio believes that this occurred on June 6, 2011. (Ricchio Test'y at 80).

6

somewhere and that he "got out of the car [] but [] never went back" because he "didn't want to face [her] and tell her [he] wasn't going back to Maine with her." (*Id.* at 190). McLean says that she called him later that day and left a message saying she had no money to get home. (*Id.* at 192). He says that he "finally" answered her calls the following day, and learned during their conversation that she had gone home to Maine. (*Id.* at 192-193).

### B. **Procedural History**

On October 7, 2015, Ricchio filed a complaint against Bijal, Inc. d/b/a Shangri-La Motel, Asvhinkumar Patel, Sima Patel, and Clark McLean. The complaint asserted seven claims under the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1589, 1590, 1591, 1592, 1593A, 1594 and 1595. The court entered a default against McLean on November 25, 2015.

On January 15, 2016, Bijal and the Patels filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. On February 15, 2016, Judge Stearns granted the motion and dismissed the complaint.

Ricchio filed a timely notice of appeal. On April 5, 2017, the First Circuit reversed the dismissal. *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017).

Ricchio then filed an amended complaint on August 3, 2017. The amended complaint asserts the same seven claims and also includes McLean as a defendant.

On October 10, 2018, Judge Stearns recused himself from the case. On the same day, the case was randomly assigned to the undersigned judge. Bijal and the Patels have moved for summary judgment in their favor.

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of [their] pleading[s]," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

The TVPA sets forth various types of trafficking-related crimes. *See* 18 U.S.C. §§ 1589, 1590, 1591, 1592, 1593A, and 1594. Those crimes include, among other things, "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing]" the labor or services of a person by means of "force," "serious harm," or "abuse." 18 U.S.C. §§ 1589, 1590.

Section 1595(a) of the TVPA provides that "[a]n individual who is a victim of a violation of [the statute] may bring a civil action against the perpetrator (or *whoever knowingly benefits*,

financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPA])." (emphasis added).

Essentially, the complaint alleges that defendants knowingly benefitted from the trafficking-related actions of McLean at the motel in violation of the TVPA. In February 2016, Judge Stearns granted defendants' motion to dismiss in an electronic order that concluded the complaint did "not allege facts that would permit a plausible inference that the motel and its managers . . . derived benefit from the trafficking of [plaintiff]."

Plaintiff appealed that decision and the First Circuit reversed. In so doing, the court held that any "payment for the motel room" could constitute a "knowing[] benefit[]" to defendants under the statute. *Ricchio v. McLean*, 853 F.3d 553, 557 (1st Cir. 2017).

In seeking summary judgment, defendants now contend that there is "no evidence that [they] benefitted in any way from the events alleged to have taken place in June [] 2011." (Def. Mem. at 12). In support of that argument, defendants appear to make several related contentions.

First, defendants contend that "even assuming . . . *arguendo* . . . that there was some sort of benefit by way of rental income or increased occupancy to Bijal, the record and discovery is *devoid* of any evidence that Asvhin and Sima [Patel] shared in those 'benefits.'" (Def. Mem. at 8). However, it is undisputed that McLean paid for the room, and both Asvhin and Sima Patel received yearly salaries and free lodging from the motel in return for their work. (Ashvin Patel Dep. at 26-28; Sima Patel Dep. at 29-31). Viewing the evidence in the light most favorable to plaintiff, it could be reasonably inferred that the Patels had a financial stake in the success of the motel, and that even the renting of a single room for a short period could constitute a "benefit" within the meaning of the statute

9

Second, defendants argue as follows:

> Simply stated, suggesting that $35 a day for about 4 days (about $140) (or even 5 or 6 days depending on which of the many versions of events [plaintiff] has given over the years) reduced by time and expense for room cleaning as a supposed 'benefit' while jeopardizing family, friends and Bijal was recording events on a four (4) camera outdoor surveillance system . . . is quite frankly, not the stuff upon which any plausible inference should be drawn nor something that a rational fact finding jury would determine to have occurred.

(Def. Mem. at 10). It is certainly the case that any financial benefit received by defendants may have bordered on the *de minimis*. Nonetheless, it does not appear that any such benefit must reach a particular threshold of value, and summary judgment therefore may not be granted on that basis.

Defendants also cite to deposition testimony of plaintiff's damages expert, Robert Levine. At his deposition, Levine stated that he had considered "information related to . . . the arrangements . . . between . . . McLean and the Patels or the motel with respect to room rates or room fees" as part of his consideration of "whether an analysis of any benefit received by the Patels or the Shangri-La Motel would be a relevant element of damages to consider in my analysis." (Levine Dep. at 41-42). Levine then stated that "there was not really sufficient information to prepare a very robust analysis, and after some dialogue with counsel, you know, we determined it was most appropriate not to consider that." (*Id.* at 42).

Defendants acknowledge that Levine's report and deposition testimony "spoke in terms of . . . damages" incurred by *plaintiff*, and not in terms of benefits obtained by defendants. (Def. Mem. at 10 n. 9). However, defendants suggest that Levine is lying, and that in reality he was hired to conduct an analysis of the benefits defendants received. Defendants allege:

> It is highly unlikely that Plaintiff's excellent attorneys and a learned CPA would try to perform an expert analysis over having paid $35 per day for a few days as an element of "damages". It is much more plausible that this was a misstatement as the true reason for this effort was to try to demonstrate whether the Bijal

10

> Defendants had received any real "benefit," suggesting once again that a rational fact finding jury cannot do so either.

(*Id.*). That accusation appears to be without basis. In fact, on the first page of his report, Levine writes "[t]his report relates *exclusively* to the quantification of damages incurred by Ricchio due to the actions of the Defendants." ((Levine Dep. at 6). (emphasis added). In any event, summary judgment may not be granted on the basis that plaintiff's expert lacks credibility.

At summary judgment, the evidence must be "viewed in the light most flattering to the nonmovant." *Medina-Munoz,* 896 F.2d at 8. Here, there is a material dispute as to whether defendants benefitted from McLean's trafficking-related actions. Accordingly, defendants' motion will be denied.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is DENIED.

**So Ordered.**

Dated: June 10, 2019

/s/ F. Dennis Saylor
F. Dennis Saylor, IV
United States District Judge